# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOHN WILLIAM MONTROSS,

Defendant-Appellant.

UNPUBLISHED
March 8, 2016

No. 325190
Isabella Circuit Court
LC No. 2014-000716-FH

Before: SERVITTO, P.J., and GADOLA and O'BRIEN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of failing to provide adequate care for 10 or more animals, MCL 750.50(4)(d), and improper disposal of an animal carcass, MCL 750.57. The trial court sentenced him to serve 30 days on each of the two counts, with credit for one day served and the remaining 29 days suspended. The court also placed defendant on probation for 12 months, required him to perform 104 hours of community service, and ordered him to pay $14,484.18 in restitution to Isabella County. We affirm.

## I. FACTUAL BACKGROUND

Defendant leased a house, barns, and cropland from Steve Johnson (the Johnson farm), which he used to live on and raise livestock. In February 2014, defendant notified Johnson that he would move out of the house in March. When Johnson believed defendant had vacated the premises, he inspected the property and discovered numerous carcasses of dead calves. Concerned about his potential liability, Johnson asked an acquaintance, Department of Natural Resources Officer Jeremy Payne, to investigate the matter.

Payne, along with Isabella County Animal Control Officer Roger Marble and county-retained veterinarian Jan Pol, visited the Johnson farm where they saw 71 dead calves strewn about the property. Most of the carcasses were in or around hutches placed on a cement slab, but they also observed carcasses protruding from a pile of manure in a field. Pol discovered three carcasses lying in manure inside of a barn. Pol estimated that the manure was 15 to 20 inches deep. Pol testified that the hutches were unsanitary because their placement on the cement slab caused manure and urine to accumulate rather than drain away. Pol also opined that the amount of straw bedding in the hutches was insufficient to keep the calves warm during the winter. A

-1-

doctor of veterinary medicine also testified that the conditions on the Johnson farm were unsanitary and did not comport with good farming practices.

The investigators discovered that defendant moved the surviving calves from the Johnson farm to a neighboring farm belonging to Ronald McDonald (the McDonald farm). With McDonald's permission, Pol and Marble observed the calves that defendant was keeping at the McDonald farm. Pol estimated that about a third of the surviving calves suffered from rickets; a condition attributable to poor nutrition. Marble later obtained a warrant, seized defendant's 22 surviving calves from the McDonald farm, and transferred the calves to another farm so they could receive appropriate care.

Before trial, defendant moved to suppress evidence obtained from the warrantless searches on the Johnson and McDonald farms. He argued that Johnson and McDonald lacked authority to consent to the searches because he rented the farm areas where the investigators discovered the calves. The trial court determined that the searches were valid pursuant to the open fields doctrine and concluded that the officers could have reasonably believed that Johnson and McDonald had authority to consent to the searches of their respective property.

## II. ANALYSIS

### A. SUPPRESSION OF THE EVIDENCE

Defendant first argues that the trial court erred by refusing to suppress the evidence obtained during the warrantless searches of the Johnson and McDonald farms. When examining a trial court's decision on a motion to suppress, we review the trial court's factual findings for clear error and the court's ultimate decision de novo. *People v Barbarich (On Remand)*, 291 Mich App 468, 471; 807 NW2d 56 (2011). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted).

Both the United States and Michigan Constitutions protect citizens from unreasonable searches and seizures by the government.[1] US Const, Am IV; Const 1963, art 1, § 11. In order to implicate these protections, the government must first conduct a search, which is defined as an intrusion on a person's reasonable or justifiable expectation of privacy. *People v Taylor*, 253 Mich App 399, 404; 655 NW2d 291 (2002). "An expectation of privacy is legitimate only if the individual exhibited an actual, subjective expectation of privacy and that actual expectation is one that society recognizes as reasonable." *Id*. "Whether the expectation exists, both subjectively and objectively, depends on the totality of the circumstances surrounding the intrusion." *Id*. at 405. In general, "when evidence has been seized in violation of the constitutional prohibition against unreasonable searches and seizures, it must be excluded from trial." *People v Dagwan*, 269 Mich App 338, 342; 711 NW2d 386 (2005).

---

[1] Absent a compelling reason to impose a different interpretation, the Michigan Constitution should be construed to provide the same protection as the Fourth Amendment of the United States Constitution. *People v Slaughter*, 489 Mich 302, 311; 803 NW2d 171 (2011).

## 1. CONSENT TO SEARCH

Johnson consented to Payne's initiation of a search on the Johnson farm, and the McDonalds consented to the search of their farm. "A consent to search permits a search and seizure without a warrant when the consent is unequivocal, specific, and freely and intelligently given." *People v Galloway*, 259 Mich App 634, 648; 675 NW2d 883 (2003). "The validity of a consent depends on the totality of the circumstances." *Id*. The record shows that Payne believed he had permission to search the Johnson farm because of a conversation he had with Johnson. Johnson testified that he gave consent to officers to search the farm when they came to the farm after Payne, Marble, and Pol performed the initial search.

Defendant contends that Johnson could not consent to the search of the property because as a landlord, he did not have the right to give consent. There was conflicting testimony about whether defendant was still leasing the premises at the time the searches occurred. In any event, even if Johnson did not have actual authority to consent to the search, the search was valid because Payne reasonably believed that Johnson had the authority to consent. "[A] third party without actual authority to consent to a search may render a search valid if the police officer's belief in the authority to consent was objectively reasonable." *People v Brown*, 279 Mich App 116, 131; 755 NW2d 664 (2008). According to Payne, Johnson told him that a renter vacated the property and left behind dead cows. Payne inquired whether there was a lease, but Johnson told him that there was "just a handshake," and that the renter was no longer there. Under these circumstances, it was objectively reasonable for Payne to conclude that Johnson had authority to consent to the search.

Additionally, the search of the McDonald farm was valid because Mr. and Mrs. McDonald consented to the search. Mr. McDonald understood his grant of permission to the officers included giving them "complete access" to the facilities on his farm. The record does not reveal evidence of a formal agreement between defendant and the McDonalds regarding rental of the facilities on the farm. Rather, Mr. McDonald told an investigator that he was simply trying to help defendant out by allowing him to keep the calves on his property. Even if the McDonalds lacked actual authority to consent to the search, the search was still valid because it was objectively reasonable for the officers to conclude that the McDonalds had authority to consent to the search under these circumstances. See *Brown*, 279 Mich App at 131.

## 2. OPEN FIELDS DOCTRINE

Moreover, the searches were independently valid under the open fields doctrine. For purposes of the constitutional protection against unreasonable searches and seizures, the curtilage of the home is considered part of the home itself. *United States v Dunn*, 480 US 294, 300; 107 S Ct 1134; 94 L Ed 2d 326 (1987). However, the Fourth Amendment's protection does not extend to "the open fields." *Id*. Whether an area constitutes part of the curtilage of the home is guided by a four-factor test: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *Id*. at 301. The central consideration is "whether the area in

question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id*.

The dead calves found in manure and compost piles on the Johnson farm were in the open fields of the farm. As for the dead calves discovered in and around the barn and hutches, the four-factor test supports the conclusion that the barn and hutches were not part of the home's curtilage. First, Johnson estimated that the barn was about 50 yards away from the home. Second, there was no indication that the barn or hutches were within an enclosure surrounding the home. Instead, Marble indicated that the property had two barns and an "open area . . . with the calf hutches." Third, defendant used the barn and hutches for raising livestock; there was no evidence that they were used for intimate activities of the home. Fourth, there was no indication that defendant made any attempt to conceal the area from passersby or those standing in open fields. Marble testified that there was nothing indicating that the area was private, and he was able to observe the dead calves "literally everywhere." Marble also explained that he did not enter the barn, but instead took a picture of the barn's contents because the barn door was open. Payne also testified that there was nothing keeping people from looking into the barnyard area, and that some of the hutches were "fully open facing the roadway." Consequently, defendant could have no reasonable expectation of privacy in the areas where the calves were found, and the search of the Johnson farm did not violate the Fourth Amendment.

The four-factor test also supports the conclusion that the buildings on the McDonald farm were not part of the curtilage. First, Mrs. McDonald estimated that the barn was 30 feet away from the house, though she admitted that the distance was probably farther than that. Second, there was no testimony that the barn or barnyard area was in an enclosure that surrounded the home. Third, the barn area was used for raising livestock; there was no evidence that defendant used the area for intimate activities of the home. Fourth, there was no indication that defendant or the McDonalds made any attempt to conceal the area from passersby or those standing in open fields. Marble testified that the calves were in a "three sided barn with an open front," and the calves were in plain view. Marble also explained that defendant kept some of the calves in an "actual barn," but it had a "fenced off area so the animals [could] come outside." Marble testified that they "never went in the barn" because the calves came outside into the pen area.

## B. VAGUENESS CHALLENGE

Defendant also argues that Michigan's animal cruelty statute, MCL 750.50b, is unconstitutionally vague. However, MCL 750.50b is not implicated in this case. Instead, defendant was charged with and convicted of failure to provide adequate care to 10 or more animals under MCL 750.50(4)(d). MCL 750.50b not being in issue, we need not consider the specifics of the argument raised.

## C. SUFFICIENCY OF THE EVIDENCE

Defendant challenges the sufficiency of the evidence under MCL 750.50b(2)(a), which provides that a person shall not "[k]nowingly kill, torture, mutilate, maim or disfigure an animal." Again, defendant was convicted for failing to provide adequate care to 10 or more

animals under MCL 750.50(4)(d). Accordingly, defendant's arguments are unavailing because he challenges the sufficiency of the evidence in relation to a statute not implicated in this case.

### D. THE RIGHT TO PRESENT A DEFENSE

Finally, defendant contends that the trial court denied him the right to present a defense and the right to a properly instructed jury by refusing to instruct the jury on his requested affirmative defense. We review de novo a defendant's claim of instructional error, *People v McKinney*, 258 Mich App 157, 162; 670 NW2d 254 (2003), as well an assertion that the defendant suffered a deprivation of his constitutional right to present a defense, *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009). "The determination whether a jury instruction is applicable to the facts of the case lies within the sound discretion of the trial court." *People v Ho*, 231 Mich App 178, 189; 585 NW2d 357 (1998).

Jury instructions are reviewed in their entirety to determine if error requiring reversal occurred. *People v Aldrich*, 246 Mich App 101, 124; 631 NW2d 67 (2001). A trial court is required to clearly present the case and instruct the jury on the applicable law. *People v Katt*, 248 Mich App 282, 310; 639 NW2d 815 (2001). Jury instructions must include all the elements of the charged offenses and any material issues, defenses, and theories that are supported by the evidence. *People v Canales*, 243 Mich App 571, 574; 624 NW2d 439 (2000). A defendant's request for a jury instruction on a theory or defense must be granted if supported by the evidence. *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). "However, if an applicable instruction was not given, the defendant bears the burden of establishing that the trial court's failure to give the requested instruction resulted in a miscarriage of justice." *Id*. Reversal for failure to provide a jury instruction is unwarranted unless it appears that it is more probable than not that the error was outcome determinative. *Id*. at 124-125.

Defendant claims that the trial court erred when it refused to provide a defense instruction based on MCL 750.50(11)(f), which states the following:

> (11) This section does not prohibit the lawful killing or other use of an animal, including the following:
>
> * * *
>
> (f) Farming or a generally accepted animal husbandry or farming practice involving livestock.

Defendant claims that he should have been able to assert that he engaged in the "lawful killing or other use of an animal" by "[f]arming or a generally accepted animal husbandry or farming practice involving livestock." As plaintiff aptly points out, however, defendant was not charged with killing the calves; he was charged with failing to provide adequate care for them under MCL 750.50(4)(d). Therefore, MCL 750.50(11) could only apply if defendant made "other use" of the calves by farming or a generally accepted animal husbandry practice. Defendant was not using the animals in a way that lead to their deaths; instead, he was raising the animals and failed to provide adequate care for them. Accordingly, this statutory section is not applicable.

Additionally, the trial court's ruling did not deny defendant the constitutional right to present a defense. "There is no question that a criminal defendant has a state and federal constitutional right to present a defense." *People v Hayes*, 421 Mich 271, 278; 364 NW2d 635 (1984). "Although the right to present a defense is a fundamental element of due process, it is not an absolute right," so a defendant must still comply with established rules of procedure and evidence. *Id*. at 279. The essence of defendant's alleged affirmative defense under MCL 750.50(11)(f) was already included in the jury instructions as part of the definition of sanitary conditions under MCL 750.50(1)(i).[2] Therefore, the trial court did not deny defendant the opportunity to present a defense.

The trial court's decision also did not deny defendant his right to a jury trial. Defendant is correct that a "criminal defendant has a right to have a properly instructed jury consider the evidence presented against him." *People v Vaughn*, 447 Mich 217, 226; 524 NW2d 217 (1994), abrogated on other grounds by *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999). However, for the reasons discussed above, defendant has not demonstrated that the jury was improperly instructed.

Affirmed.

/s/ Deborah A. Servitto
/s/ Michael F. Gadola
/s/ Colleen A. O'Brien

---

[2] Under MCL 750.50(1)(a), "adequate care" means "the provision of sufficient food, water, shelter, sanitary conditions, exercise, and veterinary medical attention in order to maintain an animal in a state of good health." Under MCL 750.50(1)(i), "sanitary conditions" means, "space free from health hazards including excessive animal waste . . . or other conditions that endanger the animal's health." The definition of sanitary conditions specifically excludes conditions *"resulting from a customary and reasonable practice pursuant to farming or animal husbandry."* (Emphasis added.)